## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES DALY and<br>GRACE IRENE PALMER, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:19-CV-06020 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| THERESA EAGLESON, Director of the | ) | |
| Illinois Department of Healthcare and | ) | |
| Family Services, and GRACE HOU, | ) | |
| Secretary of the Illinois Department of | ) | |
| Human Services, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

The Plaintiffs, James Daly and Grace Irene Palmer, are two Illinois nursing-home residents who are entitled to receive long-term care benefits under the Federal Medicaid Act, 42 U.S.C. §1396 *et seq.*[1] R. 58, First Am. Compl.[2] According to Daly and Palmer, the Illinois Department of Healthcare and Family Services (widely known in Medicaid circles as "HFS") and the Illinois Department of Human Services (known by the acronym "DHS") have ostensibly processed and approved their eligibility applications. But the problem is that, as a practical matter, HFS and DHS have allegedly denied the specific applications used for reimbursement and are not actually reimbursing the nursing homes for providing those long-term care benefits to Daly

---

[1] The Court has federal question jurisdiction under 28 U.S.C. § 1331.
[2] Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

and Palmer. Thus, Daly and Palmer allege that HFS and DHS are violating their due process rights as well as certain provisions of the Medicaid Act. Specifically, the Plaintiffs have named as defendants Theresa Eagleson, in her official capacity as Director of HFS, and Grace Hou, in her official capacity as Secretary of DHS.

In 2020, this Court dismissed the Original Complaint for lack of Article III standing. R. 50, 9/3/2020 Opinion. At that time, the nursing-home residents had failed to make any specific allegations describing any injuries that they themselves suffered, or were at concrete risk of suffering, as a result of the denial of their Medical Electronic Data Interchange admission packets. The dismissal was without prejudice, giving the Plaintiffs a chance to adequately allege standing.

Daly and Palmer filed this First Amended Complaint (all other plaintiffs dropped out of the case). The First Amended Complaint alleges the same misconduct, but now includes three new details for both Daly and Palmer: (1) they have both been billed by their facilities for uncovered long-term care; (2) they are subject to collections referrals or legal actions for their outstanding balances; and (3) their nursing homes have issued notices of involuntary transfer or discharge. R. 58, First Amended Complaint (FAC).

The Defendants have now moved to dismiss all counts in the First Amended Complaint for lack of standing, Fed. R. Civ. P. 12(b)(1), or alternatively, for failure to state a claim, Fed. R. Civ. P. 12(b)(6). The Defendants have also moved to strike Daly and Palmer's class allegations. R. 63, Defs.' Mot. Dismiss Am. Compl. For the reasons discussed below, the motion to dismiss is denied for Counts 1 and 2—though only

2

very limited discovery will go forward, as explained in the Opinion. The motion to dismiss is granted against Count 3, and the motion to strike the class allegations is granted.

## I. Background

For purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Court may also look to facts outside the pleadings in considering the Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction (including when deciding whether a plaintiff lacks standing). *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995).

The background of this case has previously been laid out in detail in the earlier Opinion, but to make sense of the facts in this case, it bears repeating. The starting point is the general application process for long-term care benefits—which, as relevant here, just means residency in a nursing home—under the Medicaid Act. HFS and DHS are the state agencies responsible for administering the federal Medicaid program in Illinois. FAC ¶¶ 5, 7, 13–14. In order to receive long-term care benefits, an Illinois resident must complete a two-part application process. First, the resident must submit a general application to receive Medicaid benefits. *Id.* ¶ 15. This application is processed by HFS, which issues an eligibility determination. *Id.* ¶ 16. Then, separate from the general-eligibility application, in order to have their nursing home care covered, a resident must also specifically request long-term care benefits. *Id.* ¶ 18. The long-term care request can be made either simultaneously with the initial Medicaid eligibility application or after the eligibility application is already approved.

3

*Id.* ¶¶ 31–32. In this case, the First Amended Complaint is not entirely clear about which specific procedure Daly and Palmer followed or the exact timing of their applications. But what is apparent is that Daly and Palmer have gone through one of the application routes and that they have been approved for Medicaid benefits in general. FAC ¶¶ 2–3. Daly and Palmer also have been specifically approved for long-term care benefits. *Id.* ¶¶ 87–88, 102. And finally, it is undisputed that Daly and Palmer are currently residing in nursing homes and receiving long-term care services. *Id.* ¶¶ 2, 3, 10–11, 81–82, 97–98.

In addition to the Medicaid and long-term care application process (or processes) for individual patients, there is a separate application for *nursing homes*—which are responsible for providing long-term care services—to receive financial reimbursements from HFS and DHS. The parties refer to this separate application process as the MEDI (which stands for "Medical Electronic Data Interchange") system. Specifically, nursing homes must submit what is called a MEDI "admission packet" to HFS for every resident who receives long-term care benefits. This is required regardless of whether a resident was approved for Medicaid long-term care services before or after entering the nursing home; either way, when the resident enters a nursing home and begins to receive long-term care, a MEDI admission packet must be submitted for each resident. FAC ¶ 32. Daly and Palmer allege that the Defendants treat each MEDI packet as an application for Medicaid long-term care benefits in and of itself. FAC ¶ 42. If the MEDI admission is approved, then the nursing home presumably receives reimbursements for any long-term care services provided by the

4

nursing home beginning on the date that the beneficiary was "admitted" into the facility.

Daly and Palmer allege, however, that HFS and DHS reject MEDI admissions for all sorts of reasons. For example, applicants are required to complete a needs-screening (referred to by yet another Medicaid acronym, "OBRA") for long-term care, but the agencies will reject a MEDI admission if the OBRA paperwork is not attached to the packet, even if the actual screening was completed on time. FAC ¶ 35. In addition, the Defendants will reject a MEDI admission if the packet is missing any financial information. *Id.* ¶ 41. The agencies have also rejected MEDI admissions when just the resident's name is misspelled or where there is a "transposition of digits in the ICD code." *Id.* ¶¶ 51–52. When these denials happen, the individual applicants are not given notice or an opportunity to appeal their MEDI admission denial. *Id.* ¶¶ 53–55. As of 2018, however, nursing home facilities do allegedly receive notice of MEDI denials; the State apparently sends out a rejection letter saying that "this is not a decision on an individual's Medicaid eligibility and, therefore, is not appealable through the Department of Human Services Bureau of Hearings." *Id.* ¶¶ 56–58. In any event, after a rejection, a new MEDI admission packet with the correct information must be submitted for the resident, and if the later application is approved, the reimbursements begin on the later date. *Id.* ¶¶ 30, 50. Palmer's MEDI packet was allegedly rejected by Defendants as untimely, which means that many of the arbitrary rejection reasons alleged above, although troubling, do not seem to apply to her. *Id.* ¶ 105. Because Daly alleges that he has not been told why his MEDI packet was

5

rejected, it is not clear at this point whether any of the above rejection reasons apply to him. *Id*. ¶ 88.

The Plaintiffs allege that these MEDI rejections, coupled with the lack of notice and opportunity to be heard, functionally allow the Defendants "to avoid paying for care for Medicaid approved beneficiaries." FAC at 2. From the perspective of Daly and Palmer, a rejection of a MEDI admission constitutes either a denial of an application for long-term care benefits (or a withdrawal of those benefits if the resident had previously been approved for them). *Id*. ¶¶ 91, 110. For Daly and Palmer, the facts appear to be as follows: they were approved for long-term care, and at some point, the nursing homes submitted MEDI packets on their behalf. FAC ¶¶ 87–88, 102–05. Palmer's MEDI packet was rejected as untimely, and Daly was not given a reason for his rejection. *Id*. Because the MEDI packets were rejected, the nursing homes are presumably not being reimbursed, functionally denying Daly and Palmer's long-term care benefits. The result, the Plaintiffs allege, is that Daly has been billed by his facility for more than $136,000 in uncovered long-term care costs, for which he is now subject to collections referrals or legal actions for this outstanding balance, and that his facility has issued a Notice of Involuntary Transfer or Discharge because of the non-payment. FAC ¶¶ 93–95. The same goes for Palmer, but she has been billed for around $70,000 in costs. *Id*. ¶¶ 112–14.

Seeking injunctive and declaratory relief, Daly and Palmer assert three claims based on the agencies' rejections of their MEDI admission packets. First, Daly and Palmer (invoking 42 U.S.C. § 1983) allege that the agencies have violated their due-

process rights by rejecting the MEDI admission packets without providing the Plaintiffs with notice or an opportunity to be heard. FAC ¶¶ 90–92, 107–11. Daly and Palmer also allege that the agencies have violated the medical-assistance and nursing-facility provision of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(4)(A), as well as the reasonable-promptness provision of the same statute, 42 U.S.C. § 1396a(a)(8). FAC ¶¶ 145, 150. The agencies have moved to dismiss all claims for lack of standing and failure to state a claim. Defs.' Mot. Dismiss Am. Compl.

## II. Legal Standard

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal of a claim where there is a lack of subject matter jurisdiction. A motion under 12(b)(1) can also seek to dismiss a claim for lack of standing. *See Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). In deciding a motion to dismiss for lack of standing, the Court must accept as true all material allegations of the complaint, drawing reasonable inferences in the plaintiffs' favor. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (cleaned up). The plaintiffs bear the burden of establishing the required elements of standing. *Id.* (cleaned up).[3]

The question of Article III standing is one of jurisdiction, and addresses "whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (cleaned up). Under Article III of the Constitution, federal jurisdiction is

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

limited to claims presenting a case or controversy between the plaintiff and the defendant. *Id*. In order to establish constitutional standing, the party invoking federal jurisdiction must demonstrate "a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (cleaned up). That being said, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

This case boils down to the following allegation: HFS and DHS are ostensibly doing their jobs by approving applications for long-term care benefits under Medicaid, but when it comes time to actually reimburse nursing homes for providing those benefits to eligible recipients, the agencies invoke petty reasons to reject the MEDI admission packets submitted by nursing homes, fail to notify the actual beneficiaries about the MEDI rejections, and thus successfully circumvent their duty to pay for approved long-term care benefits. R. 68, Pls.' Resp. Br. at 8–9. In essence, Daly and Palmer claim that the rejection of the MEDI admissions is functionally the same as the rejection of their long-term care applications; after all, merely *approving* a long-term care application is meaningless if there is no way for the beneficiary to actually *receive* those benefits—in this case, reimbursement to the nursing homes for providing 24-hour care. As mentioned earlier, Daly and Palmer assert a constitutional procedural due process claim as well as statutory claims under the Medicaid Act. FAC ¶¶ 145, 150.

The agencies do not deny (for purposes of the dismissal motion) that as a general matter they have rejected MEDI admission packets and that they have failed to provide notice of those rejections to the individual nursing home residents who are eligible to receive long-term care. They do, however, deny (with fervor) that Daly and Palmer have had *their* MEDI admission packets denied. R. 64, Defs.' Br. at 5. But none of that matters anyway, the agencies argue, because at the end of the day, a rejection of a MEDI admission packet does *not* amount to a denial or withdrawal of

long-term care benefits, so this practice (if it is happening) cannot be the cause of the Plaintiffs' injuries, and even so, the nursing homes issued the discharge notices, not Defendants. *Id.* at 5–6. For instance, the MEDI process does not affect the eligibility determination for any individual resident. *Id*. at 7. Most importantly, the Defendants point to the undisputed fact that Daly and Palmer are both currently receiving long-term care. *Id.* at 2. Specifically, Daly and Palmer are living in nursing homes, and they have not (yet) been involuntarily discharged from their respective nursing facilities. *Id*. at 6–7. According to the defense, the fact that the agencies are in practice allegedly failing to reimburse the facilities for providing care is of no consequence. If anything, the Defendants argue, this is at most a billing dispute between the agencies and the nursing facilities, and even then, there is no case between the Defendants and the nursing-home residents because it is the nursing homes who have billed the Plaintiffs and issued the notices of possible involuntary discharge. *Id*. Thus, the agencies maintain, Daly and Palmer have no standing to bring these claims. *Id.* at 7.

## A. Standing

The agencies divide their argument that Daly and Palmer lack standing into two broad categories (with sub-categories, to be sure): (1) insufficient injury under Article III; and (2) there are no private causes of action under the governing statutes. The second category is not actually a matter of standing or subject matter jurisdiction, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998) (explaining that "the absence of a valid … cause of action does not implicate subject matter jurisdiction"); *Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 458 (7th Cir. 2007) ("A private

right of action is not a component of subject-matter jurisdiction"), so that leaves the injury-in-fact requirement as the challenge to jurisdiction.

The agencies argue both that Daly and Palmer have failed to plead an injury in fact and have failed to plead a causal connection between any injury and the Defendants. Those are the first two elements of the Article III standing test. "To establish standing, a plaintiff must show (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury." *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 527 (7th Cir. 2001). And to establish standing for prospective injunctive relief in particular, "a plaintiff must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)) (cleaned up). "Unlike with damages, a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Simic*, 851 F.3d at 738.

Here, the Plaintiffs have adequately alleged injury in fact and causation (though the allegation will be tested in discovery). The first time around, the Court held that the Original Complaint lacked any allegations of injuries that the Plaintiffs themselves suffered (or were at concrete risk of suffering) as a result of the denial of their MEDI admission. 9/3/2020 Opinion. This time, the First Amended Complaint

11

contains the previous factual allegations and adds a few new ones—and they are crucial. As in the previous complaint, Daly and Palmer allege that their MEDI admission packets have been rejected. FAC ¶¶ 88–105. Daly and Palmer were not given notice of these rejections, nor were they given an opportunity to appeal the rejections. *Id.* ¶¶ 90–92, 107–10. Although Daly and Palmer do not state the causal link explicitly, it is a reasonable inference from the pleadings that the rejection of the admission packets caused them to be billed for their uncovered care, and thus their respective nursing homes have allegedly issued discharge notices for failure to pay—placing them at risk of losing their care and housing. The alleged lack of payments also have subjected the Plaintiffs to collections referrals or legal actions based on these outstanding balances. Without notice or the opportunity to appeal, Daly and Palmer have no available administrative remedies. All of those consequences—lack of coverage, risk of discharge, and risk of collections referrals—are qualifying injuries in fact.

Having said that, the allegations are just that—allegations. The Defendants refute the claim that Daly and Palmer's MEDI admission packets have been rejected. Defs.' Br. at 5. The Defendants correctly note that, in a case like this, in which the defendant denies the truth of jurisdictional allegations, the Court may look beyond the pleadings to consider evidence submitted to determine if subject matter jurisdiction exists. *See Queen v. Alvarez*, 979 F. Supp. 2d 845, 846 (N.D. Ill. 2013) (citing *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F. 3d 440, 443–44 (7th Cir. 2009)). The agencies point to the affidavit of Mark McCurdy, which avers that Daly and Palmer both have active MEDI admissions. R. 64-1, Defs.' Exh. A, McCurdy Decl. at 1.

According to the agencies, Daly's MEDI admission date was December 31, 2018, and Palmer's was October 31, 2017. *Id*. Although the Court can review this evidence, it is not a *carte blanche* to ignore Daly and Palmer's allegations right now. There has been no discovery on this point, and according to Daly and Palmer, their MEDI admissions packets have been rejected and the bills and discharge notices followed. FAC ¶¶ 87–88, 102–05. These allegations, taken as true, provide sufficient injury in fact for Article III standing. But because the Plaintiffs' standing hinges on the denial of their MEDI packets and the ensuing discharge notices and alleged indebtedness, the parties shall first engage in limited jurisdictional discovery. The discovery shall address whether the MEDI packets were in fact denied; the how, when, and why the discharge notices were issued; and the indebtedness of Daly and Palmer for uncovered care, and the potential for collections and lawsuits.

On causation, the agencies try to lay all blame at the feet of the nursing homes. The nursing homes are the parties who have allegedly issued the bills and discharge notices. FAC ¶¶ 95, 114. To involuntarily discharge a long-term care beneficiary for non-payment would allegedly be against state and federal law. So, according to the Defendants, the nursing homes bear the sole causal responsibility, not the agencies. Defs.' Br. at 8. This argument implies that the benevolence of nursing homes who continue to care for beneficiaries without being reimbursed somehow satisfies the agencies' obligations under the Medicaid Statute because their beneficiaries are still receiving care despite the lack of payments. That cannot be so.

13

The nursing homes' alleged wrongdoing does not simply cancel out the agencies own allegedly arbitrary rejection of Daly and Palmer's MEDI admission packets, which in turn allegedly prevented financial reimbursement for the Plaintiffs' eligible care—all without notice or opportunity to be heard or an appeal. Both things can be true. In support, the Defendants cite only *Bria Health Servs. v. Eagleson*, 950 F.3d 378, 385 (7th Cir. 2020). But there is a key difference. In *Bria Health*, the plaintiffs conceded that the nursing-home residents had *not* been threatened with discharge. 950 F.3d at 385. Daly and Palmer allegedly have in fact been threatened with discharge. What's more, the legal questions at issue in *Bria Health* concerned the relationship between third-party consultants and their derivative standing. *Id*. Nothing in the Seventh Circuit's decision in that case suggests that a nursing homes' potential violations of federal law undermines the causal relationship between the agencies' alleged refusal to pay and Daly and Palmer's injuries. Daly and Palmer have adequately a sufficient causal connection to the agencies' alleged misconduct.

## B. Enforceability Under Section 1983

Moving on, the agencies next argue that there are no private causes of action available under the Medicaid sections at issue here, namely, the requirement to provide qualified individuals for medical assistance, 42 U.S.C. § 1396a(a)(10)(A) (which incorporates nursing-facility services), § 1396d(a)(4)(A)) (Count 2), and the requirement to provide assistance with reasonable promptness, 42 U.S.C. § 1396a(a)(8) (Count 3). As explained next, on Count 2, the Defendants are wrong—the medical-assistance requirement, §§ 1396a(a)(10)(A), 1396d(a)(4)(A), is enforceable through 42

14

U.S.C. § 1983. For Count 3, the Defendants are right. Section 1396a(a)(8) is not enforceable under § 1983 and there can be no claim for assistance with reasonable promptness.

### 1. Section 1396a(a)(10) (Nursing-Facility Services)

Section 1396a(a)(10) requires that State Medicaid plans provide for medical assistance to qualified individuals, including nursing-facility services, § 1396d(a)(4)(A). The question is whether individuals may bring a private cause of action to enforce that requirement under 42 U.S.C. § 1983. "In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, 340 (1997) (emphasis in original). "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga Univ. v. Doe,* 536 U.S. 273, 284 (2002).

Here, the agencies face an uphill battle, because the Seventh Circuit has already decided that § 1396a(a)(10)—the overall medical-assistance provision—indeed is enforceable via § 1983. *Bontrager v. Indiana Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 607 (7th Cir. 2012); *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993). Against this, the agencies contend that §§ 1396a(a)(10) and 1396d(a)(4)(A), when read together, only define the services that are available. Defs.' Br. at 4. This is at odds with the plain, mandatory language of the statutes. Section 1396a(a)(10) provides that, under federal Medicaid law, a "State plan for medical assistance *must* ... provide ... for making medical assistance available ... to all [eligible]

individuals." 42 U.S.C. § 1396a(a)(10) (emphasis added). Next, Section 1396d defines medical assistance as "payment of part or all of the cost" of the enumerated services—§ 1396d(a)(4)(A) includes nursing-facility services as part of that list.

The medical-assistance provision (§ 1396a(a)(10)) together with the nursing-facility services provision (§ 1396d(a)(4)(A)) are enforceable under § 1983. The reasoning in *Miller* (and again in *Bontrager*) make this clear. *Miller* addressed almost exactly the same two provisions at issue here: the overall medical-assistance requirement, § 1396a(a)(10), and another type of services in § 1396d(a)(4), specifically § 1396(a)(4)(B). 10 F.3d at 1316. The only difference between the two is that subsection (a)(4)(A) (at issue here) provides for nursing-facility services and subsection (a)(4)(B) (as issue in *Miller*) covers certain screening, diagnostic, and treatment services. That difference does not matter in evaluating the enforceability of the statute under § 1983. Generally speaking, federal courts consider three things to determine whether a statute creates a right enforceable under § 1983: (1) whether Congress intended to confer individual rights to the plaintiff, as evidenced by rights-creating language; (2) whether the right is not so vague and amorphous that its enforcement would strain judicial competence; and (3) whether the statute unambiguously imposes a binding obligation on the States, such that the provision is couched in mandatory, rather than precatory, terms. *Blessing,* 520 U.S. at 340–41; *see also Gonzaga*, 536 U.S. at 285; *Wilder v. Virginia Hospital Association,* 496 U.S. 498, 509 (1990).

Here, as in *Miller*, each requirement is met. As described earlier, States participating in the Medicaid program "must" provide nursing-facility services to those

who are eligible. §§ 1396a(a)(1), 1396d(a)(4)(A). This is rights-creating language for individuals. *Miller*, 10 F.3d at 1319. This satisfies the first element under *Blessing* and *Gonzaga*. Skipping ahead to the third consideration, that too is satisfied because the statute imposes a mandatory obligation on the State, not just an aspirational one. *Miller*, 10 F.3d at 1319. Finally, § 1396a(a)(10) and § 1396d(a)(4)(A) meet the second element—together, the statutes require the State to pay for "nursing facility services" for Medicaid-eligible adults. This is as concrete as the requirement to pay for "early and periodic screening, diagnostic, and treatment services," § 1396d(a)(4)(B), which passed muster in *Miller*. 10 F.3d at 1319–20.

The agencies try to cast doubt on *Miller* by relying on *Nasello v. Eagleson*, 977 F.3d 599, 602 (7th Cir. 2020). That case does help the defense in refuting the enforceability of the reasonable-promptness requirement (Count 3). But it does not help undermine the nursing-facility services requirement. *Nasello* does not, despite the defense argument, Defs.' Brief at 3, cast a pall over the enforceability of all the requirements in § 1396a(a). *Nasello* specifically only addressed § 1396a(r)(1)(A) and § 1396a(a)(8). In doing so, the Seventh Circuit differentiated between statutes that set forth conditions on states' participation in a program (not enforceable) rather than those that conferred individual rights (enforceable). *Nasello*, 977 F.3d at 601. If the Seventh Circuit had intended to overrule its own precedent and wipe out all § 1983 enforceability for § 1396a(a)(10), then there would have been no needed to distinguish between state-participation conditions and individual rights. Indeed, after deciding *Nasello*, the Seventh Circuit again cited *Bontrage*r for the proposition that "section

17

1396a(a)(10) satisfies *Wilder* and permits private right of action enforceable through section 1983." *See Talevski by next friend Talevski v. Health & Hosp. Corp. of Marion Cty.*, 6 F.4th 713, 725 (7th Cir. 2021). *Miller* and *Bontrager* remain intact, and Daly and Palmer may bring a claim under §§ 1396a(a)(10)(A) and 1396d(a)(4)(A) via 42 U.S.C. § 1983.

### 2. Section 1396a(a)(8) (Reasonable Promptness)

In contrast, the Seventh Circuit has twice expressed "skepticism"—albeit without outright holding—over the enforceability of the reasonable-promptness requirement in § 1396a(a)(8). *See, e.g., Nasello* 977 F.3d at 602; *Bertrand v. Maram*, 495 F.3d 452, 457–58 (7th Cir. 2007). Remember that § 1396a(a)(8) requires that State plans:

> provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals[.]

§ 1396a(a)(8). In expressing "skepticism" over the enforceability of § 1396a(a)(8) via § 1983, *Nasello*, 977 F.3d at 602, the Seventh Circuit pointed to more recent precedent, post-*Wilder*, rejecting private causes of action involving Spending Clause legislation, *id.* at 601 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015); *Astra USA, Inc. v. Santa Clara Cty., Cal.*, 563 U.S. 110 (2011); *Gonzaga*, 536 U.S. 273.

Even more recently, in *Saint Anthony Hospital v. Eagleson*, 2021 WL 2894169, at *14 (N.D. Ill. July 9, 2021), the district court held that the reasonable-promptness provision was not enforceable via § 1983. The decision acknowledged that § 1396a(a)(8) does contain some mandatory text directed at benefitting individuals.

*Id.*[4] But the district court held that the statutory admonition of "reasonable prompt-ness" is too "vague and amorphous," *Blessing*, 520 U.S. at 340–41, for a court to en-force, *Saint Anthony Hosp.*, 2021 WL 2894169, at *14. This Court agrees. The statute sets forth no definition of "reasonable promptness," and it is not at all apparent how courts would go about evaluating the reasonableness of how quickly assistance is pro-vided to individuals. From where would the court derive the standard? Would the court take into account the type of medical assistance? The extent of it? Its cost? The enforcement of a vague standard like "reasonable promptness" in providing medical assistance would "strain judicial competence," *Blessing*, 520 U.S. at 341, and thus § 1396a(a)(8) is not enforceable via § 1983. Count 3 is dismissed, this time with prej-udice.

### C. Other Challenges to the Amended Complaint

In attacking the adequacy of the complaint, the agencies make three argu-ments: (1) the entire lawsuit is barred by Eleventh Amendment immunity; (2) Daly and Palmer have not met the *Iqbal-Twombly* pleading standard for any of the three claims; and (3) any allegations about the failure to make timely decisions on the long-term care applications of the purported class are covered by another case in this Dis-trict, *Koss v. Norwood*, 305 F. Supp. 3d 897 (N.D. Ill. 2018). The Court addresses each argument in turn.

---

[4]The plaintiff in *Saint Anthony Hospital* was a hospital, not an individual patient, so the absence of statutory text aimed at benefitting the health care providers (as distinct from individuals) further undermined the plaintiff's attempt to enforce the reasonable-promptness provision. 2021 WL 2894169, at *14.

### 1. Eleventh Amendment

The Eleventh Amendment bars lawsuits against States for monetary damages, unless the State has unequivocally consented to the suit or unless Congress has validly authorized the suit based on a federal constitutional provision. *Green v. Mansour*, 474 U.S. 64, 68 (1985); *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 374 (7th Cir. 2010); *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). This sovereign immunity extends to state agencies, like DHS and HFS here, because a state agency is simply an arm of the State. *Council 31 of the Am. Fed'n of State, Cty. & Mun. Employees, AFL-CIO v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012). But there is an exception to sovereign immunity: the *Ex parte Young* doctrine establishes that a plaintiff may sue government officials, in their official capacities, in order to obtain *prospective* injunctive relief (not monetary damages) from an ongoing violation of federal law. *Indiana Prot. & Advocacy Servs.*, 603 F.3d at 371; *see also Will*, 491 U.S. at 71, n.10. Daly and Palmer, based on what they allege, are seeking this precise type of prospective relief for allegedly ongoing violations of federal law, in the form of injunctions and declaratory judgments and declaratory relief—not money damages.

The agencies argue that Daly and Palmer are *actually* seeking an order requiring the agencies to pay the Plaintiffs (or provide payments for the Plaintiffs). According to the agencies, Daly and Palmer want their nursing homes to be reimbursed for the time period between which they entered the nursing home and when their nursing home submitted their MEDI applications. Defs.' Br. at 10. That type of relief, the

argument goes, is tantamount to an award for damages for a *past* violation of federal law—and this is so even if the relief is "styled as something else." *See Papasan v. Allain*, 478 U.S. 265, 278 (1986). If the remedy that Daly and Palmer truly seek is backward-looking reimbursement for a time period before their MEDI admission packets were submitted, that would be barred, even if it were dressed up and styled as prospective relief.

To repeat, the agencies assert that Daly and Palmer never had their MEDI packets rejected, they have current admissions, and their nursing homes are being reimbursed on an ongoing basis, so there is no ongoing violation of federal law. Defs.' Br. at 10. The Court agrees that, under this set of facts, the suit indeed would be barred by the Eleventh Amendment. But right now, as explained earlier, discovery is warranted to figure out the injury (if any) allegedly suffered by Daly and Palmer. Daly and Palmer maintain that their MEDI admission packets were rejected, so they are being charged—going forward—for non-payment and that they continue to be denied any notice or opportunity to appeal these *de facto* long-term care rejections. Maybe discovery will reveal that the agencies are correct, but at this point, these are well-pleaded facts in the First Amended Complaint and are accepted as true, with reasonable inferences drawn in Daly and Palmer's favor. *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). Taking Daly and Palmer's current allegations as true, there is no Eleventh Amendment bar at this point.

## 2. Adequacy of Claims

Moving on to whether the individual claims are adequately pleaded, first up is the due-process claim. "To state a claim for a procedural due process violation, a plaintiff must demonstrate (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Forgue v. City of Chicago*, 873 F.3d 962, 969 (7th Cir. 2017). The agencies do not argue that Daly and Palmer lack cognizable property interests.[5] Instead, the question is whether the Plaintiffs adequately alleged that they have received insufficient process. "The requirements of due process include a determination of the issues according to articulated standards." *White v. Roughton*, 530 F.2d 750, 754 (7th Cir. 1976). Daly and Palmer have alleged that when their MEDI admission packets were rejected, they were not given notice or an opportunity to appeal this denial. FAC ¶¶ 91–92, 107–109. They have further alleged that because their MEDI packets were rejected without notice or opportunity to appeal, they are being denied access to their long-term care Medicaid benefits by the failure to reimburse the nursing homes in violation of the Due Process Clause of the Fourteenth Amendment. Again, although the nursing-home facilities do allegedly now receive notice of the MEDI denials, the rejection letters explicitly say they cannot be appealed. Based on these facts, which we must take as true at this point, the due-process claim (Count 1) is adequately alleged.

---

[5]Indeed, the parties agree that this case is not about the initial Medicaid eligibility applications; to the extent that the Plaintiffs are claiming that their *eligibility determinations* have been delayed or that they have not received notice or an opportunity to be heard, that is the subject of a different class-action lawsuit, *Koss v. Norwood*, 305 F. Supp. 3d 897 (N.D. Ill. 2018). This case is specifically about the MEDI admission packets required for nursing homes to receive payments for providing long-term care to beneficiaries.

For Count 2, the Defendants make a general argument that Daly and Palmer have not met the pleading standard. The agencies argue that there are no allegations that they are violating Daly and Palmer's rights. Defs.' Br. at 10. In making this argument, the agencies again put forth their own version of the facts, repeating that Daly and Palmer's applications have been approved and they are eligible for services on an ongoing basis. The limited discovery might very well prove the agencies' version of the facts to be true, but factual development will have to wait. In the Defendants' own words: "Section 1396a(10)(A) of the Medicaid Act (with reference to Section 1396d(a)(4)(A)) provides certain long-term care rights to certain eligible individuals." Defs.' Br. at 10. Daly and Palmer's key claims that their MEDI packets have been rejected, that they were not given notice or opportunity to appeal such decisions, and that as a result of the agencies arbitrarily rejecting their MEDI packets they are now being threatened with discharge, legal action and collections, sufficiently alleges that the agencies are violating §§ 1396a(a)(10) and 1396d(a)(4)(A). Count 2 survives for now.[6]

---

[6]There is no need to address the adequacy of the allegations on Count 3, that is, the reasonable-promptness claim under § 1396a(8)(a), because there is no enforceable claim under § 1983 for that provision. It is worth noting that the First Amended Complaint contains allegations throughout the pleading that really have nothing to do with either Plaintiff. For examples: the agencies' failure to process long-term care applications; the agencies failure to make determinations on nursing-home residents' MEDI packets within 45 days; and a refusal to backdate benefits based on the original MEDI admission date. FAC ¶¶ 50, 152, 156. Whatever their merit (or lack thereof), these allegations do not form the basis of valid claims advanced by the Plaintiffs.

### 3. Class Allegations

Finally, the agencies ask this Court to reject Daly and Palmer's proposed class action by striking the First Amended Complaint's class allegations. In step with the notion that many of the facts alleged in the First Amended Complaint are unrelated to Daly and Palmer, the agencies argue that the class allegations should be stricken at this stage because Daly and Palmer do not even belong to the alleged class. Defs.' Br. at 12. The defense is correct.

Granting a motion to "strike" class allegations at the pleading stage is a rarity. Indeed, the ordinary motion to "strike" under Civil Rule 12(f) does not specifically mention class-certification decisions within its ambit. *See* Fed. R. Civ. P. 12(f) (authorizing courts to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"). Almost always, discovery is needed before deciding whether the various requirements of Federal Rule of Civil Procedure 23 have been met. It is thus generally inappropriate to cut short a proposed class before discovery has begun.

Having said that, Rule 23(c)(1)(A) does encourage early resolution of class-certification decisions: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The Seventh Circuit has held that this rule allows a court to deny class certification even before a motion for certification has been filed. *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). Here, it is crystal clear, just on the face of the First Amended Complaint, that Daly

and Palmer do not belong to the proposed class. The First Amended Complaint sets forth the class definition:

> All persons who require long-term care at a skilled nursing facility and are residing at a skilled nursing facility in the State of Illinois, who are eligible for Long-term Care Medicaid and who submitted Long-term Care Medicaid applications and/or MEDI admission packets and either 1) have not received a determination on their application by Defendants within forty-five days of submitting their application, or 2) who were approved for Long-term Care Medicaid benefits, and who have not had their admission packets processed within 45 days.

FAC at 20. But according to their own allegations, Daly and Palmer have both already received their determinations. FAC ¶ 88 (Daly), ¶ 105 (Palmer). The entire thrust of the Plaintiffs' assertion that they have been injured is that Daly's and Palmer's MEDI packets have been processed and *rejected*. It is apparent from the First Amended Complaint that Daly and Palmer propose a class action in which they themselves are not members. There is no reason to delay a decision on class certification. The motion to strike the class allegations is granted.

## IV. Conclusion

The motion to dismiss is denied in part and granted in part. Counts 1 and 2 survive, but are subject to limited discovery as discussed in the opinion. Count 3 is dismissed, this time with prejudice, because there is no valid claim under § 1983 to enforce the reasonable-promptness requirement. The motion to strike is granted. The status hearing of October 8, 2021, is reset to October 15, 2021 at 8:30 a.m., but to

track the case only (no appearance is required, the case will not be called). Instead, the parties shall file a proposed discovery schedule by October 8, 2021.[7]

ENTERED:

      s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 27, 2021

---

[7]The Court urges the Plaintiffs to carefully consider how to move forward. If the facts are really what the defense has asserted, then discovery would be wasteful (and potentially abusive).